IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 19-cv-03710-RM-NRN

EMINA GEROVIC,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, a Body politic and corporate of the State of Colorado, acting by and through its DEPARTMENT OF GENERAL SERVICES and FACILITIES MANAGEMENT OPERATIONS;
LEROY LEMOS, in his official capacity as Facilities Management Operations Supervisor at the Department of General Services, and in his individual capacity;
MURPHY ROBINSON, in his official capacity as Executive Director of General Services, and in his individual capacity;
JAMES E. WILLIAMSON, in his official capacity as Facilities Management Operations Director at the Department of General Services, and in his individual capacity;
KEVIN O'NEIL, in his official capacity as Facilities Management Operations Deputy Director at the Department of General Services, and in his individual capacity;
JOEL WOMICK, in his official capacity as DGS Contingent Worker at HSS Inc., and in his individual capacity;
KYLE KNOEDLER, in his official capacity as DGS Facility Supervisor of HSS Inc., and in his individual capacity; and
HSS, INC., a Colorado Corporation, acting as a hired agent by the City and County of Denver, by and through their contingent workers, Joel Womick, Kyle Knoedler, and others,

Defendants.

---

## CITY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

Pursuant to Fed.R.Civ.P. 56 and the Court's Practice Standards – Civil Actions, IV.C.2, Defendants the City and County of Denver, the Department of General Services and Facilities Management, Leroy Lemos, Murphy Robinson, James Williamson, and Kevin O'Neil

(collectively, the "City Defendants"), respectfully provide this Separate Statement of Undisputed

Material Facts in Support of Their Motion for Summary Judgment.


*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

| | Moving Party's Statement of Undisputed Material Facts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 1. | Plaintiff, a Caucasian female of Bosnian ethnicity, worked as a Custodian in the Facilities Management Department of the Department of General Services for the City and County of Denver from August 11, 2014 through November 27, 2017. Second Amended Complaint, Doc. 53, ¶¶ 4, 13. | | |
| 2. | Leroy Lemos (Hispanic), the Operations Supervisor at General Services during Plaintiff's tenure with the City (Doc. 53, ¶ 6), served on the three-person hiring committee who unanimously decided to offer Plaintiff a position with the City. Lemos Deposition, **Ex. 1** at 24:10. | | |
| 3. | At the time of Plaintiff's employment with the City, James Williamson (African-American) was the Director of Facilities Management. Doc. 53, ¶8; Plaintiff Deposition, **Ex. 2**, 25:12-14. | | |
| 4. | At the time of Plaintiff's employment with the City, Kevin O'Neil (Caucasian) was the Deputy Director of Facilities Management.  Doc. 53, ¶ 9. | | |
| 5. | Plaintiff testified that Mr. O'Neil did not discriminate against her.  **Ex. 2**, 26:14-15. | | |
| 6. | Murphy Robinson (African American) became the Executive Director of General Services on September 11, 2017.  Robinson Declaration, **Ex. 3** at ¶ 1. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 7. | Plaintiff testified she saw/interacted with Mr. Robinson only twice during her tenure with the City (**Ex. 2**, 24:10-13) and that he did not in any way discriminate against her or discipline her (**Ex. 2**, 23:25-24:2, 24:25-25:1). | | |
| 8. | As the Operations Supervisor, Mr. Lemos lacked authority to issue any formal discipline independently; while he was authorized to sign written reprimands (and nothing higher), he could not issue a written reprimand absent approval from his Director James Williamson.  **Ex. 1**, 42:3-14; Lemos Declaration, **Ex. 4**, at ¶ 2. | | |
| 9. | Under the City's Career Service Rules, a written reprimand is the least severe form of discipline that may be issued (Career Service Rule 16-42(B), **Ex. 5**) and does not result in a loss of pay or any other change in employment status (Anne Carter Declaration, **Ex. 6**, ¶ 30). | | |
| 10. | The Career Service Rules do not recognize verbal counselling sessions, reprimands, or warnings as forms of discipline; and they do not result in a demotion, loss of pay, or any other change in employment status. **Ex. 5, Ex. 6** at ¶ 29). Only Mr. Williams and Mr. Murphy, when he became employed, could issue discipline above a written reprimand to General Services employees. **Ex. 6** ¶ 31. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF) | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 11. | On September 21, 2015, Plaintiff received a "Verbal reprimand" from Custodial Supervisor James Stigall (Caucasian) for not wearing her safety shoes (**Ex. 7**) which did not result in a pay change, change in job duties, or any other change in employment status. Doc. 53, ¶18c; **Ex. 2**, 62:15-19. | | |
| 12. | On October 1, 2015, Plaintiff received a Verbal Warning from Custodial Supervisor Tony Rios (Hispanic) for receiving a poor to fair inspection report rating. Doc. 53, ¶18d, **Ex. 8**. | | |
| 13. | On June 13, 2016, Mr. Lemos gave Plaintiff a documented counseling conversation regarding her personal use of her City-issued cell phone. Doc. 53, ¶18e; **Ex. 9**. Plaintiff admitted during her deposition that her use of the work phone was a "mistake." **Ex. 2**, 76:19-25. | | |
| 14. | Plaintiff alleges she complained to Mr. Williamson about unfair treatment in the Fall of 2016 (**Ex. 10**, p. 11) and she may have complained to him in May of 2017 (**Ex. 2**, 115:23-116:5). | | |
| 15. | On March 17, 2017, Plaintiff received a documented counseling conversation from Mr. Rios regarding her failure to answer her phone when Mr. Lemos called and the fact that her voice mail did not work.  Doc. 53, ¶18f; **Ex. 2**, 88:6-89:1; **Ex. 11**. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 16. | Plaintiff testified that the March 17, 2017 documented counseling had nothing to do with her not being Hispanic (**Ex. 2**, 90:16-18) and that Mr. Robinson and Mr. O'Neil were not involved in this action (**Ex. 2**, 89:24-90:7). | | |
| 17. | On May 4, 2017, Mr. Lemos issued Plaintiff a revised Written Reprimand Disciplinary Action. **Ex. 12**. | | |
| 18. | The May 4, 2017 reprimand states: "On Monday, March 16, 2017, I, LeRoy Lemos, FM Operations Supervisor, received a phone call from an irate Denver Motor Vehicles (DMV) office customer Brian J. who was calling on his phone with Daniel G. (witness to incident) standing next to him so that he could hear the complaint to verify and correct anything Brian was saying." **Ex. 12**. | | |
| 19. | The reprimand states, that "Brian" (African American)  told Mr. Lemos that "he entered the Arie P. Taylor Building (APT) via the unlocked East entrance;" "proceeded down the stairs to the 1st floor lobby to await the DMV office to open, where he encountered Daniel G. also waiting." **Ex. 1**, 52:10-53:10; **Exs. 4** at ¶¶ 4-5, 12. | | |
| 20. | The reprimand states, "Daniel said that he got lucky and the nice city worker [Plaintiff] let him in" the building.  **Ex.1**, 52:10-53:10; **12**. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 21. | The written reprimand states that Plaintiff then "came into the lobby" and "told [Brian] the building was not yet open and he needed to wait outside;" which led to a verbal exchange that was overheard by several witnesses. **Ex. 12**. | | |
| 22. | Stanford Pollard, an HSS security agent, submitted a written statement referred to in the written reprimand, which stated that he gave Mr. Lemos' phone number to Brian and that Plaintiff tried to talk to Mr. Pollard during the day. **Exs. 12, 13**. | | |
| 23. | Sequoya Palin, another HSS security agent, submitted a written statement referred to in the written reprimand, which said that Plaintiff told her that she let Daniel into the building, accused Mr. Stanford of stabbing her in the back for giving Mr. Lemos' phone number to Daniel, and complained to Ms. Palin about the incident throughout the day. **Exs. 4** at ¶ 8, 12, 14. | | |
| 24. | As stated in the written reprimand, Jerrick Perkins, another City employee, was interviewed and reported that Plaintiff told him she was worried she was going to get into trouble for letting Daniel into the building and that Mr. Pollard betrayed her and stabbed her in the back by giving out her supervisor's phone number. **Ex. 12**. Anne Carter interviewed him. **Ex. 6** ¶5. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 25. | The written reprimand states that Ms. Carter and Mr. Lemos met with Plaintiff about the incident on March 17, 2017, and Plaintiff told them that she did not let Daniel into the building, that she did not talk to any HSS employees about the incident and that she did not talk to Jerrick Perkins about the incident; and they asked Plaintiff to draft a written statement, which she never did. **Exs. 4** at ¶10, **6** at ¶ 8, 12. | | |
| 26. | The written reprimand states that a report of the "security camera footage" showed Brian coming through the unlocked door, but not Daniel, which matches the information that Plaintiff let Daniel in through the other door.  **Exs. 4** at ¶ 11, 12. | | |
| 27. | Plaintiff was originally injured at work and placed on concurrent workers' compensation leave/FMLA leave from July 24, 2017 through August 13, 2017. The City paid Ms. Gerovic wage replacement benefits during that period of time. Lorman Declaration, **Ex.  15**; **Ex. 16**, CCD  0269; **Ex. 17**. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF) | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 28. | Anna Forsberg (Caucasian), a City employee, testified under oath during Plaintiff's administrative appeal of her termination that in September of 2017, Ms. Forsberg was told by her daycare provider that a City Custodian, Plaintiff, was representing herself as a Denver Police Officer on her public Facebook page and Ms. Forsberg took a screenshot of the page and sent it to Anne Carter. **Ex. 18**. | | |
| 29. | Mr. Lemos thereafter viewed Plaintiff's Facebook page, which listed her occupation as "Police Officer" and her employer as "Denver Police Department,"  (**Ex. 19**, CCD_5331-5333); and included pictures of Plaintiff wearing a t-shirt with a "DPD" emblem (**Ex. 19**, CCD_5337), wearing a DPD patrol person's hat (**Ex. 19**, CCD_5334-35); her DPD-issued access card that also features a DPD badge (**Ex. 19**, CCD_5336); and her wearing a hooded sweatshirt with a "DPD" emblem (**Ex. 19**, CCD_5338); **Ex. 4** at ¶ 13. | | |
| 30. | In the comments section of these photographs with Plaintiff wearing the police hat, a commenter refers to Plaintiff as a "policewoman" in Bosnian. **Ex. 6 at** ¶ 12; **Ex. 19**, CCD_5334-35. | | |
| 31. | Plaintiff was issued a Contemplation of Discipline letter on September 19, 2017 setting a Contemplation of Discipline meeting to take place on September 28, 2017. **Ex. 6** at ¶ 15, 20. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 32. | On September 20, 2017, Mr. Lemos provided Plaintiff a Notice of Change in Work Location letter stating she was being assigned to the Castro Building and her shift would be 1:30 p.m. to 10:00 p.m. (**Ex. 21**). Information regarding this meeting is included in Plaintiff's termination letter (**Ex. 22**, p. 5) and Mr. Lemos testified under oath about that meeting during Plaintiff's administrative appeal hearing of her termination (**Ex. 23**); **Ex. 4** at ¶ 15. | | |
| 33. | Kevin O'Neil testified under oath during Plaintiff's administrative appeal hearing that he was the one that decided to change Plaintiff's location. **Ex. 24**, CCD_2042:8-20, O'Neil Declaration, **Ex. 25**, ¶3. | | |
| 34. | Plaintiff met with Kevin O'Neil on September 21, 2017, regarding the location and shift change. Mr. O'Neil prepared a statement regarding this meeting (**Exs. 25**, ¶4, **26**), information from that statement is referred to in Plaintiff's termination letter (**Ex. 22**, pp. 5-6), and Mr. O'Neil testified under oath about that meeting during Plaintiff's administrative appeal hearing of her termination (**Ex. 24**, CCD_2043-46). | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 35. | Plaintiff then went to Mr. Robinson's office. Mr. Robinson prepared a statement regarding this meeting (**Ex. 3** at ¶ 9, **27**), some information from that statement is included in the termination letter (**Ex. 24**, p.6), and Mr. Robinson testified under oath about that meeting during Plaintiff's administrative appeal hearing of her termination (**Ex. 28**). | | |
| 36. | During her meeting in Mr. Robinson's office, Plaintiff admitted to Mr. Murphy that she had made a mistake with her Facebook posts.  **Ex. 2**, 157:2-4. | | |
| 37. | Plaintiff testified that while she was in Mr. Robinson's office, she was "crying" and said something to the effect of "even if I am killing myself... even if I killed myself to" prove how good I'm working.  **Ex. 2**, 155:20-156:11. | | |
| 38. | Mr. Robinson heard Plaintiff say she was going to kill herself, which caused him to fear for her safety.   **Exs. 3** at ¶ 7, **27**. | | |
| 39. | As a result, on September 22, 2017, Plaintiff was placed on paid administrative leave and she was scheduled for a fitness for duty exam. **Ex. 6** at ¶ 22; **Ex. 29**, 105:24-106:8; **Ex. 30**. | | |
| 40. | The Administrative Leave Action Notice stated Plaintiff should not report to the workplace and Anne Carter instructed her the same. **Ex. 6** at ¶ 21; **Ex. 29**, 110:18-20; **Ex. 30**. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 41. | Despite that, Plaintiff entered her workplace, a secure area, on the morning of September 22, 2017 and was discovered by her supervisor. **Ex. 1**, 79:19-80:10; **Exs. 4** at ¶ 18, **6** at ¶ 21; **Ex. 29**, 119:4-10; **Ex. 31**. | | |
| 42. | Therefore, the City asked HSS to create a Be-on-the-Lookout Poster ("BOLO") so Plaintiff's department could be aware of when she was entering City facilities during her administrative leave. **Ex. 1**, 80:1-10; **Ex. 29**, 110:20-25. | | |
| 43. | The BOLO is directed to "HSS Employees in ALL Buildings" and states "[i]f [Plaintiff] is seen entering ANY Building, contact your supervisor immediately." **Ex. 32**, September 22, 2017 BOLO. | | |
| 44. | The BOLO did not result in any demotion, reduction in pay, or other significant change in job status. **Ex. 6** at ¶ 21. | | |
| 45. | Plaintiff was placed on administrative leave with pay for nine days from September 22, 2017, through October 3, 2017, and then was returned to her work as a custodian on the same shift with the same pay and no other change in benefits. **Ex. 2**, 167:11-22; **Ex. 6** at ¶ 24; **Ex. 16**, p. 6. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 46. | On or about October 3, 2017, Plaintiff received a Notice of Change in Work Location (**Ex. 33**) which amended the manager's name on her September 21, 2017, Notice of Change in Work Location (**Ex. 34**) which changed her schedule back to 6:00 a.m. to 2:30 p.m. **Ex. 4** at ¶ 19, **Ex. 34**. Plaintiff testified this change did not affect her duties, shift, or pay (**Ex. 2**, 167:16-22) and, in fact, put her closer to home (**Ex. 2**, 138:16-23). | | |
| 47. | On October 5, 2017, City employee Amber Escobedo told Mr. Lemos that she had concerns about Plaintiff and he directed her to share her concerns with the City's HR Department. **Ex. 4** at ¶ 20. | | |
| 48. | Ms. Escobedo told Anne Carter with HR that she had worked with Plaintiff on a number of occasions and that Plaintiff's attitude and language were generally quite inappropriate, vulgar, and offensive. **Ex. 6** at ¶ 26. Ms. Escobedo signed a written statement (**Ex. 35**) which was used for Plaintiff's termination letter (**Ex. 22**, p. 7) and Ms. Escobedo testified under oath during Plaintiff's administrative appeal hearing of her termination (**Ex. 36**). | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 49. | The Contemplation of Discipline letter of September 19, 2017, was subsequently revised and re-issued on October 18, 2017, to include additional information regarding the Facebook posts, Plaintiff's 9/20/17 meeting with Mr. Lemos, Plaintiff's 9/21/17 meeting with Mr. O'Neil, her 9/21/17 meeting with Mr. Robinson, her 9/22/17 appearance at Police District 5, and the information relayed by Ms. Escobedo.  **Ex. 6** at ¶ 27; **Ex. 29**, 124:12-20; **Ex. 37**. Plaintiff admitted that the October 18, 2017 Notification of Contemplation of Disciplinary Action letter was not issued because of complaints she had filed.  **Ex. 2**, 191:24-192:2. | | |
| 50. | In accordance with the Career Service Rules, a contemplation of discipline meeting was held on October 31, 2017, where Plaintiff was represented by an attorney and had the opportunity to discuss everything in the Contemplation of Discipline Letter. **Ex. 6** at ¶ 28. | | |
| 51. | After the contemplation meeting, Defendant Williams made the determination to terminate Plaintiff and testified under oath to that effect at Plaintiff's administrative appeal hearing of her termination. **Ex. 38**, CCD_2129, 2144:16-2145:2. | | |
| 52. | The decision was not based in any way on Plaintiff's race, color, national origin, ethnicity, or ancestry.  Williams Declaration, **Ex. 39**, ¶3. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 53. | Mr. Lemos was not involved in the decision to terminate Plaintiff. **Ex. 1**, 76:23-77:2; **Ex. 4** at ¶ 21; **Ex. 39**, ¶3. Plaintiff testified that she has no evidence that either Defendant Robinson or O'Neil were involved in her termination. **Ex. 2**, 201:13-18 | | |
| 54. | On November 27, 2017, Mr. Williams issued a Notification of Dismissal to Plaintiff. **Ex. 22**. Plaintiff was never replaced by the City. **Ex. 4** at ¶ 27. | | |
| 55. | Ms. Gerovic went back on concurrent workers' compensation leave/FMLA leave for the same injury on October 20, 2017 (**Ex. 40**) through December 6, 2017 (**Ex. 41**). **Ex. 15** ¶4, **Ex. 16**, CCD_275-277. Ms. Gerovic was not released to return to full duty by her medical provider until December 6, 2017 and received workers' compensation wage replacement benefits from the City until that time. **Exs. 16**, ¶7, **17**.  Because Ms. Gerovic was not released to full duty by her medical provider until after her termination, she never returned from concurrent workers' compensation leave/FMLA leave and never returned to her custodial position. **Ex. 15**, ¶6. | | |
| 56. | Plaintiff testified that she believes she would have received the Notification of Dismissal even if she had not taken FMLA leave and even if she had not filed complaints.  **Ex. 2**, 199:21-200:5. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 57. | Plaintiff testified that Mr. Robinson did not retaliate against her, Mr. O'Neil did not retaliate against her, that she "can't say now" whether Mr. Williamson retaliated against her, and that "[o]nly Leroy Lemos" retaliated against her and only because "she has a great relationship with the police department and he doesn't." **Ex. 2**, 207:5-23. | | |
| 58. | The Notification of Dismissal states: "Your [Facebook] profile is of concern as you list the Denver Police Department as your employer and list your occupation as 'Police Officer.' . . . [Y]ou also posted several pictures in 2015 showing yourself wearing a sweatshirt with a Denver Police Department embroidered badge, wearing a patrolman's hat, wearing a t-shirt with an embroidered DPD patch and a close-up photo of your DPD-issued access card that also features a DPD badge." (**Ex. 22**, pp. 3-4). | | |

|   | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 59. | The Notification of Dismissal further states: "Falsely identifying yourself to the public as a police officer is both troubling and unacceptable.  In your position as a custodian, you routinely interact with members of the public.  Be wearing clothing items that have police badges, posting pictures of yourself in police issued clothing and posting a copy of your police building access card, you can create public confusion regarding your role, responsibilities and duties.  It can also be dangerous to you and the public, should someone need police assistance or intervention and come to you for help.  Representing yourself as a police officer, as a joke or to impress others, is not only deceitful, but could be perceived as impersonating a police officer, which is a serious offense."  (**Ex. 22**, pp. 4-5). | | |
| 60. | The Notification of Dismissal reports Plaintiff's conduct with Mr. Lemos on September 19, 2017 (**Ex. 22**, p. 5), with Mr. O'Neil (*Id.*, pp. 5-6), and Mr. Robinson (*Id.*, p. 6) on September 21, 2017; at DPD District 5 on September 22, 2017 (*Id.*), emails received (*Id.*), and an employee report that Plaintiff's "attitude and language was very inappropriate on a consistent basis" (*Id.*, p. 7). | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 61. | The Notification of Dismissal states: "Your activities do not follow protocols, were not completely truthful and were disrespectful to FM management.  Your use of worktime and involving others in your personnel matters was disruptive to the workplace.  You have been advised of this inappropriate activity in the past yet continued to take worktime to spread rumors and complaint about your management team." **Ex. 22,** p. 7. | | |
| 62. | Plaintiff filed her EEOC Charge on September 21, 2018, and checked the boxes for "retaliation," "race," and "color," but did not check the box for "national origin discrimination." **Ex. 2**, 22:20-23:4; **Ex. 42**. | | |
| 63. | Plaintiff's EEOC Charge does not reference discrimination based on incidents involving comparators "Lucia," Annette Subia, or Sharon Romero. **Ex. 42**. | | |
| 64. | During her employment, at least two of Plaintiff's four direct supervisors were Caucasian, James Stigall and Russ Vander Kooy. **Ex. 2**, 27:2-20, 29:14-16. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 65. | Plaintiff alleges that Mr. Lemos discriminated against James Stigall (Caucasian), a Supervisor, by holding a meeting with him every Tuesday, after which Mr. Stigall would return crying (**Ex. 2**, 31:15-24), and that Mr. Stigall was given "bogus write-ups" and was "treated differently because he was white," such that "he felt that he had no choice but to resign, which he did in 2015" (**Ex. 10**, pp. 4-5). | | |
| 66. | Plaintiff alleges Mr. Lemos discriminated against Keith Dochterman (Caucasian) (**Ex. 10**, pp. 4-5); but testified that she did not know whether Mr. Dochterman was ever disciplined (**Ex. 2**, 35:8-10), other than Mr. Dochterman telling her he was (*Id*. 35:19-22). | | |
| 67. | Plaintiff alleges that Mr. Dochterman was "verbally harassed by Leroy Lemos frequently, for no legitimate reasons other than discrimination, and due to his fear of being improperly fired because of discriminatory motives, he decided to voluntarily resign from employment in 2016." **Ex. 10**, p.5. | | |
| 68. | Viola Chacon (Hispanic) was a custodian who was found to have violated five Career Service Rules, including Rule 16-29(D), prohibiting any act of dishonesty, resulting in her termination by Mr. Williamson. **Ex. 4** at ¶24; **Ex. 43**, June 15, 2017 Notification of Dismissal Disciplinary Action. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 69. | Plaintiff identifies Danielle Garcia (Hispanic) as a similarly-situated employee. Doc. 53, ¶ 17(b), **Ex. 10**, p.6. She was actually a Utility Worker who Mr. Williamson demoted to the position of custodian she violated the Career Service Rules. **Ex. 4** at ¶25; **Ex. 44**, June 2, 2017 Notification of Involuntary Demotion Disciplinary Action. | | |
| 70. | Unlike Plaintiff, at the time of her demotion, Ms. Garcia had only received one verbal reprimand in 2014. **Ex. 4** at ¶25; **Ex. 44**, p. 6. Unlike Plaintiff, Ms. Garcia did not misrepresent herself as a police officer, behave dishonestly, or enter a City building without prior authorization on administrative leave. **Ex. 44**. | | |
| 71. | Plaintiff identified "Teresa" [Luyando] as another similarly-situated comparator. (Doc. 53, ¶ 17(b); **Ex. 10**, p.6) on the basis that Ms. Luyando, who worked for the City for 15 or 20 years, had many problems and write-ups at work, but was not terminated (**Ex. 2**, 53:10-19; 54:14-21). There is no such evidence. | | |
| 72. | Plaintiff asserts that a co-worker named David Chavez was making 50 cents more per hour than her at the time he started working for the City in March of 2016. Doc. 53, ¶18(b), **Ex. 2**, 58:6-7). At the time Mr. Chavez was hired by the City, he had been a Facilities Manager at DPS for 22 years. **Ex. 4** at ¶23. | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 73. | Plaintiff identified John Gandara as a similarly-situated comparator (**Ex. 10**, p.5) on the basis that both she and Mr. Gandara did not wear required safety shoes, yet she was the only one who received a verbal reprimand from Mr. Stigall (Caucasian) on September 21, 2015. **Ex. 2**, 37:6-17. | | |
| 74. | Plaintiff testified that Mr. Gandara was treated differently because when she was on light duty with a workers' compensation injury in October of 2017, she had to work near Mr. Lemos, while Mr. Gandara worked in the rec center. **Ex. 2**, 37:20-25; 39:1, 13-16. | | |
| 75. | Plaintiff alleges that a "half Hispanic" Custodian named Lucia was treated differently "over three years ago" because she (Plaintiff) had to strip and wax Lucia's floor, at a time when Lucia had been employed by the City for 20 or 25 years. **Ex. 2**, 40:1-2, 16-23; 41:5-8. | | |
| 76. | Plaintiff alleges that Yvonne Chavez, a Supervisor in the Utility Department, was treated differently from her because Ms. Chavez performed a white-gloved inspection of Plaintiff's floor and stairs in the Police Administration Building. **Ex. 2**, 41:13-42:2; 43:23; 44:3-7; **Ex. 10**, p.6). | | |

| | Moving Party's Statement of Undisputed MaterialFacts ("MSUMF") & Supporting Evidence | Opposing Party's Response and Additional Facts and Supporting Evidence (OSUMF") | Moving Party's Reply and Supporting Evidence ("RSUMF") |
|---|---|---|---|
| 77. | Plaintiff alleges that custodian Annette Subia was treated differently because Ms. Subia was responsible for only half a floor in the Police Administration Building while Plaintiff was responsible for three floors and the trash. **Ex. 2**, 42:11-25. | | |
| 78. | Plaintiff identified Sharon Romero as a comparator (**Ex. 10**, p.6), alleging she was treated differently in "May or June" of 2017 because Ms. Romero came to District 5 and started "harassing me about the trash in [the] parking lot," and Mr. Lemos "didn't do anything." **Ex. 2**, 44:20-45:24. | | |
| 79. | Messrs. Williamson, O'Neil, and Lemos relied on the information in the multiple witness statements and honestly believed Plaintiff violated the conduct rules identified in the May 2017 Written Reprimand and the individual City Defendants honestly believed that Plaintiff committed the rule violations in her termination letter. **Exs. 3** ¶ 10; **4** ¶¶ 12, 21; **25** ¶¶ 2, 6; **39** ¶¶ 2, 4. | | |
| 80. | Plaintiff admits her verbal reprimand, verbal warning,  documented counseling, and written reprimand, had any effect on her future employment prospects. **Ex. 2**, 62:15-19; 69:13-15; 89:12-23, 95:21-96:1. | | |

Submitted May 21, 2021.

SHELBY A. FELTON
NATALIA S. BALLINGER
Assistant City Attorneys

*s/  Shelby A. Felton*
Denver City Attorney's Office
201 W. Colfax Avenue, Dept. 1108
Denver, Colorado 80202
(720) 913-3125
E-mail:  shelby.felton@denvergov.org
E-mail:  natalia.ballinger@denvergov.org
E-mail:  dlefiling.litigation@denvergov.org
*Attorneys for the City Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2021, a true and correct copy of the foregoing **CITY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Nathan Davidovich
Davidovich Law Firm, LLC
501 S. Cherry St., Suite 1100
Denver, Colorado 80246
nathandavidovich@talk-law.com

Michael A. Watts
Retherford, Mullen & Moore
2 N. Cascade, Suite 500
Colorado Springs, Colorado 80903
mwatts@rmmattys.com

*s/ Kimberly Berridge*
Denver City Attorney's Office